## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK
## ROCHESTER DIVISION

| | |
|---|---|
| AEI DRAWBACK SERVICES, INC. DBA DHL DRAWBACK SERVICES, AND RADIX GROUP INTERNATIONAL, INC. DBA DHL GLOBAL FORWARDING,<br><br>DHL Drawback,<br><br>v.<br><br>JENNIFER LYMAN AND R. SCOTT ARMSTRONG,<br>Defendants. | Civil Action No.: 1:25-cv-1158<br><br>**Jury Trial Demanded** |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiffs AEI Drawback Services, Inc., dba DHL Drawback Services ("AEIDS") and Radix Group International, Inc., dba DHL Global Forwarding ("DHL GF") (collectively, "DHL Drawback"), file this Complaint for injunctive relief and damages against Defendants Jennifer Lyman ("Lyman") and R. Scott Armstrong ("Armstrong") (collectively, "Defendants").

### I.    INTRODUCTION

1.    Armstrong is the former Chief Financial Officer of AEIDS and the current owner of North American Drawback Services LLC ("NADS").

2.    Lyman is a former employee of AEIDS and current employee of NADS.

3.    NADS was founded by former AEIDS President and Manager Robert Micah McDonald ("R. McDonald").  AEIDS and NADS are direct competitors in providing duty drawback services to customers.

4.    In 2019, R. McDonald entered into a Management Agreement with DHL Drawback to provide "operational and management services" to AEIDS and in exchange was paid millions

of dollars per year in management fees, all of which he received through NADS. A true and correct copy of the Management Agreement is attached as Exhibit 1.

5.    As Vice President of Operations of AEIDS, Lyman was also well compensated, earning well over a million dollars a year in annual compensation.

6.    On August 26, 2025, DHL GF informed R. McDonald that DHL Drawback would not renew the Management Agreement. R. McDonald responded by activating Lyman and Armstrong, among others, to carry out a coordinated attack to solicit and transfer DHL Drawback's business to NADS and solicit and hire all of AEIDS' employees in violation of the non-compete, non-solicitation, and non-disclosure restrictive covenants that R. McDonald agreed to in the Management Agreement. The scheme created by R. McDonald, his sister Allisyn McDonald, and Defendants involved, not just the solicitation and transfer of AEIDS' employees and customers, but also misappropriation of AEIDS' trade secrets and confidential information and the sabotage of AEIDS' continued business operations.

7.    After allegedly "retiring" from the drawback industry in December 20024 and with full knowledge of the plan to execute a coordinated attack on AEIDS' business, in September 2025, Armstrong engaged in a sham transaction with R. McDonald through which Armstrong paid $650,000 to purchase all of R. McDonald's ownership in NADS. The plan was for NADS to directly benefit from R. McDonald's violations of his restrictive covenants while R. McDonald purported to "distance" himself from NADS to avoid liability for his illegal actions.

8.    The scheme would not have been possible without Lyman's involvement.  As one of AEIDS' key operational employees with access to all of AEIDS' systems, Lyman worked directly with R. McDonald to set up a competing business (NADS) while making over a million dollars a year working for AEIDS.

9.      The scheme culminated in October 2025 after DHL Drawback terminated the Management Agreement With Cause. In coordination with R. McDonald and his sister, Defendants solicited at least ten AEIDS employees to NADS on a single day while simultaneously taking AEIDS' computer systems offline, locking AEIDS out of its own systems.

10.      On October 16, 2025, Lyman resigned first, and nine AEIDS employees followed the same day, immediately activating "out of office messages," which intentionally prevented any type of knowledge transfer or transition of work. Lyman approved the PTO for the departing employees knowing that their coordinated and abrupt departure would halt all work for AEIDS and leave no employees in the New York office to service customers.

11.      Despite Lyman's status as a Licensed Customs Broker acting on behalf of AEIDS, she coordinated the mass departure of employees to abandon the office and then exploited their departure by directly reaching out to DHL Drawback's customers to inform them that her and others at AEIDS were leaving the company, that service would degrade if they stayed with AEIDS, and soliciting them to leave AEIDS and move their business to her new employer (NADS).

12.       The coordinated mass departure of 9 employees on a single day created confusion among DHL Drawback's customers. When employees from DHL Drawback visited AEIDS' Rochester office after the mass resignation, they found that almost all of its supplies and equipment (including computers) had been moved out of the AEIDS office. Indeed, NADS opened an office just 20 minutes away from AEIDS' Rochester office and was operational one day after all of AEIDS' employees resigned from the Rochester office.

13.      Despite having worked for AEIDS and its predecessor company for 27 years and serving as AEIDS' Licensed Customs Broker, under which she had both fiduciary and statutory obligations, Lyman failed to transition any information or knowledge to DHL Drawback when she

departed. This was intentional. Lyman's refusal to meet with DHL Drawback representatives for a handover of information, to turn over access credentials to AEIDS' systems, or to provide any information whatsoever about the status of pending client matters was, by design, intended to sabotage AEIDS business and irreparably harm its ability to provide continued service to customers.

14.     Her failure to provide access credentials and her failure to use the servers set up by DHL Drawback that would have provided it full access effectively resulted in AEIDS being locked out of its own systems.

15.     On October 21, 2025, DHL Drawback filed suit against R. McDonald, A. McDonald, and NADS in the U.S. District Court for the Southern District of Texas (Case No. 4:25-cv-5030) seeking a temporary restraining order, preliminary injunctive relief, and monetary damages (the "Texas Action"). *See* Texas Action, ECF No. 1.

16.     On October 28, 2025, the Southern District of Texas entered a Temporary Restraining Order ("TRO") enjoining R. McDonald, A. McDonald, and NADS from using or divulging DHL Drawback's confidential and trade secret information and from continuing to solicit DHL Drawback's customers and employees. The TRO also required R. McDonald and NADS "to immediately cease any business relationship related to duty drawback services with any DHL Drawback Customer" and "to immediately cease any employment or contractor relationship with any former AEIDS employee." A true and correct copy of the Temporary Restraining Order is attached as Exhibit 2.

17.     As owner of NADS, Armstrong is obligated to ensure NADS' compliance with the TRO. The TRO also prevents NADS from employing Lyman.

18.     DHL Drawback seeks herein similar relief and monetary damages to address the equally egregious acts committed by Lyman and Armstrong in coordination with R. McDonald, NADS, and A. McDonald.

## II.    PARTIES, JURISDICTION, AND VENUE

19.     AEIDS is organized and exists under the laws of the State of Ohio with is principal place of business in Texas.

20.     DHL GF—which is the sole owner of AEIDS—is organized and exists under the laws of the State of Ohio with its principal place of business in Florida.

21.     Lyman is the former Vice President of Operations of AEIDS. She resides in and worked for AEIDS in Rochester, New York.

22.     Armstrong is the Managing Member of NADS, which operates an office in Pittsford, New York. Armstrong resides in Albion, New York.

23.     Under 28 U.S.C. § 1332, this Court has diversity jurisdiction over this matter because no Plaintiff shares the same state of citizenship as any Defendant.

24.     Under 28 U.S.C. § 1331, this Court has federal-question jurisdiction over DHL Drawback's Defend Trade Secrets Act ("DTSA") claim and Computer Fraud and Abuse Act ("CFAA") claim.

25.     Under 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the remaining causes of action in this Complaint because they form part of the same case or controversy as DHL Drawback's federal claims.

26.     Venue is proper in the Western District of New York because Defendants' conduct about which DHL Drawback complains occurred in Rochester, New York.

27.    This Court maintains general personal jurisdiction over Lyman and Armstrong because they are both New York citizens.

### III.    FACTUAL BACKGROUND

### AEIDS Company Information

28.    AEIDS is engaged in the business of providing duty drawback services to companies. AEIDS' customers are businesses that import and export goods and pay customs duties, fees, and taxes associated with the import and/or export of those goods. Duty drawback services include the filing and processing of claims with the applicable customs authority for the recovery of customs duties, fees, and taxes on behalf of customers.

29.    AEIDS operates two offices: one in Houston, Texas and the other in Rochester, New York.

30.    Armstrong worked for AEIDS between on or about July 1, 2002 until on or about December 31, 2024 when he allegedly "retired." At the time of his separation from AEIDS, Armstrong was AEIDS' Chief Financial Officer.

31.    Lyman was Vice President of Operations for AEIDS, based in its Rochester, New York office. She worked for AEIDS from in or around August 1998 until her abrupt resignation, without notice, on October 16, 2025.

32.    As Vice President of Operations, Lyman was responsible for overseeing the business operations of AEIDS. She is also a Licensed Customs Broker and, while employed by AEIDS, she owed statutory obligations to AEIDS, as her license was associated with AEIDS.

33.    While employed by AEIDS, Armstrong and Lyman both reported directly to R. McDonald in his role as Manager and President of AEIDS.

34.    While employed by AEIDS, Armstrong supervised Lyman's mother, Joanne O'Brien, who worked at AEIDS. Lyman supervised Armstrong's son, Mark Armstrong, who also worked at AEIDS.

35.    As Vice President of AEIDS, Lyman had fiduciary obligations to AEIDS, including a duty of loyalty that required her to act in the best interests of AEIDS.

### R. McDonald's Management Agreement

36.    R. McDonald's Management Agreement contains a noncompetition restriction, a non-solicitation restriction, and confidentiality obligations.

37.    Pursuant to the noncompetition covenant, R. McDonald is restricted, directly and indirectly, from providing duty drawback services to any AEIDS customer and being associated with, owning, or acquiring a competing business engaged in the provision of duty drawback services for the duration of his employment with AEIDS and for three years thereafter.[1]

38.    R. McDonald's non-solicitation covenant restricts him from, directly or indirectly, soliciting employees and customers of AEIDS and interfering in AEIDS' customer or business relationships.

39.    R. McDonald also agreed to keep confidential and not disclose or use in any manner adverse to the interests of AEIDS any confidential information, including all information disclosed to him through the course of his employment about AEIDS and its employees, advertising methods, public relations methods, business plans, processes, trade information, methods and forecasts, customers, finances, trademarks, trade secrets and other intellectual property, and any other information which he should reasonably understand to be confidential. Upon the termination

---

[1] While the noncompetition restriction is three years, in the Texas action, DHL Drawback is seeking to enforce it for only two years.

of his employment with AEIDS, R. McDonald was required to return to AEIDS all confidential information. However, he did not return any information or property after the Management Agreement was terminated and his employment ended.

40.    R. McDonald's covenants are reasonably necessary to protect AEIDS' legitimate business interests, including safeguarding its confidential information and trade secrets; protecting its substantial relationships with specific existing customers; and preventing the loss of goodwill among customers as a result of its employees leaving their employment.

41.    To operate its business and distinguish itself from competitors, AEIDS generates and relies on confidential information, including trade secrets. This confidential information includes AEIDS' business operation methods; billing/rate information; customer lists, which contain the identities of its customers; customer-related account information and files, including customer contract details; prospective customer pipelines; and information contained in AEIDS' claims processing software

42.    AEIDS takes reasonable steps to protect the confidentiality of this information, including by ensuring that its employees comply with confidentiality obligations in customer non-disclosure agreements, password-protecting systems to ensure that only authorized employees can access the information, and appropriately restricting access to information to only those employees with a business need.

43.    Lyman and Armstrong tortiously interfered with R. McDonald's non-competition and non-solicitation covenants by, *inter alia*, working with the R. McDonald and his sister, Allisyn McDonald, to solicit AEIDS employees for employment with NADS, soliciting customers to terminate their relationship with AEIDS to work with NADS, and using and disclosing AEIDS' confidential information for the benefit of its direct competitor, NADS.

## Defendants Prepare to "Activate" NADS

44.     In 2024, Lyman and R. McDonald engaged AEIDS' IT vendor on behalf of AEIDS to develop a proprietary duty drawback claims processing software. Although the Statements of Work were prepared for DHL Drawback and one was signed by Lyman as Vice President of Operations for DHL Drawback, Lyman and R. McDonald intended to develop Duty Max for NADS and then license it back to AEIDS for a fee.

45.     Without DHL GF's knowledge or consent, Lyman and R. McDonald used AEIDS resources to work on the development of the new Duty Max software, including instructing AEIDS employees to test the software. Upon learning of the new software development, DHL GF began investigating the scope and purpose of the IT vendor's engagement and ultimately learned that the new software was intended for the benefit not of DHL Drawback but of NADS. McDonald and Lyman misappropriated DHL Drawback's resources to benefit its competitor.

46.     Although Lyman has been working with R. McDonald and A. McDonald since 2024 while employed by AEIDS, to set up NADS as a competing business, Lyman signed a Retention Bonus Agreement with DHL GF in September 2025 to remain employed with DHL Drawback through August 31, 2026. She did this to mislead DHL Drawback into believing that she would be available to assist with AEIDS' continued business operations after the end of the Management Agreement.

47.     Yet Lyman had no intention of remaining with AEIDS after the Management Agreement expired or was terminated. Indeed, in 2024, R. McDonald, Lyman, and Armstrong discussed activating NADS to compete with AEIDS as soon as the Management Agreement ended. Knowing that NADS was planning to use improper and illegal means to steal DHL Drawback's

clients, and with knowledge of R. McDonald's restrictions, Armstrong expressly stated his desire to purchase an interest in NADS.

48.    Lyman encouraged the AEIDS employees in the Rochester office to also sign Retention Bonus Agreements (which they did) to mislead DHL Drawback into believing that the employees would remain with DHL Drawback through the months following the end of the Management Agreement. She did this while scheming with R. McDonald and A. McDonald for the mass departure of every employee of the Rochester office.

### Transition of NADS to Armstrong

49.    On or about September 15, 2025, Armstrong entered into a Membership Interest Purchase Agreement with R. McDonald, pursuant to which R. McDonald sold NADS to Armstrong for $650,000.

50.    At the time of the purchase, Armstrong had full knowledge that R. McDonald had non-competition, non-solicitation and non-disclosure restrictions in his Management Agreement. Armstrong also knew that on September 15, 2025, R. McDonald was still working as Manager and President of AEIDS and had fiduciary obligations to AEIDS.

51.    Armstrong paid $650,000 to purchase NADS because, as the former CFO of AEIDS, he knew the value R. McDonald, A. McDonald, and Lyman would create by bringing DHL Drawback's customers and AEIDS employees to NADS, allowing NADS to be operational immediately after the Management Agreement ended.

### Coordinated Attack on AEIDS

52.    In October 2025, despite his obligations under his Management Agreement and fiduciary obligations as President and Manager of AEIDS, R. McDonald refused to work with the incoming leader of AEIDS on the restructuring and transition. As a result of this, combined with

R. McDonald's prior breaches and competitive activities, DHL GF terminated the Management Agreement With Cause on Monday, October 13, 2025, just under three weeks before it would have expired.

53.    That same day, Defendants, acting in concert with R. McDonald and A. McDonald, launched a coordinated attack against AEIDS to solicit its employees and customers, steal its confidential information, empty its offices, and lock it out of its own systems.

54.    First, Lyman and A. McDonald instructed AEIDS employees to pack up customer files and send them directly to customers via SharePoint.

55.    Then, Armstrong sent A. McDonald NADS job offer letters addressed to AEIDS employees. The job offers were for positions with NADS that were similar or identical to the positions the employees held for AEIDS and expired by the end of the week, on October 17, 2025, at 5 p.m. A. McDonald delivered the NADS job offers to AEIDS employees at the AEIDS Houston office while she was still working for AEIDS.

56.    To induce AEIDS employees to accept the NADS job offers, on or about October 15, 2025, Lyman and A. McDonald told AEIDS employees that DHL GF would not pay them the bonuses promised to them, but NADS would pay their AEIDS bonuses if they accepted the NADS offers. This was a blatant misrepresentation intended to cause confusion among the AEIDS staff; indeed all communications to AEIDS employees about bonuses would have come from R. McDonald, A. McDonald and/or and Lyman, and DHL GF had no knowledge of any bonuses promised to AEIDS employees.

57.    In addition, to persuade older employees to accept the NADS job offers, Lyman, A. McDonald, and R. McDonald told AEIDS employees that DHL GF would not hire employees over

60. This statement was also demonstrably false, as DHL GF had given retention agreements to AEIDS employees regardless of age.

58.     This underhanded scheme worked. In a single day, 11 AEIDS employees departed (9 from the Rochester office and 2 from the Houston office), three of whom "retired," and one who indicated that he had been "fired." All 9 employees in the Rochester left on the same day within a few hours of each other.

59.     As part of the coordinated attack to shut down AEIDS, five of the departing employees abruptly added out of office messages to their emails with a return date of October 31, 2025, leading customers to believe there were no AEIDS employees left to service their accounts.

60.     Lyman also resigned on the mass resignation day, effective immediately. Her resignation, with no notice or transition support whatsoever, was particularly harmful to AEIDS, because Lyman held administrative rights to AEIDS' systems and accounts. When DHL GF contacted Lyman to coordinate the transition of critical business information (including logins with administrative rights and systems access information), she failed to do so.

61.     Specifically, Lyman failed to timely transition logins and passwords and administrative rights, all of which DHL Drawback expressly requested from Lyman because this information is critical to running its drawback business. What is more, Lyman refused DHL Drawback's instruction to return the keys to the Rochester office. Instead, she left the keys to the office inside the locked office, effectively locking DHL Drawback out of its own office.

62.     On the day of the mass resignations, AEIDS' server suddenly went offline for nearly a full business day. While the system was down, Lyman, using AEIDS' confidential information, immediately began contacting DHL Drawback's customers, brazenly soliciting them to move with her to Armstrong's company, NADS. Lyman falsely told DHL Drawback customers that services

at AEIDS would "degrade," implying that it would be unable to effectively service their accounts following the departures of its employees which Lyman caused.

63.    A. McDonald did not immediately resign, remaining at AEIDS so that she could continue feeding Lyman and R. McDonald information about its customers and remaining employees. A. McDonald also began (while still employed by AEIDS) to contact customers and sow uncertainty over how AEIDS would be able to service their accounts in light of the recent changes in an effort to plant seeds of doubts in their minds and induce them to move their accounts to NADS. When it learned of her misconduct, DHL Drawback immediately removed A. McDonald from her position.

64.    In an effort to preserve the business, DHL GF representatives went to the Rochester office on October 16, 2025. What they found was alarming. Lyman and other former AEIDS employees acting in concert with Armstrong's company, NADS, had cleared the office almost entirely out, leaving behind only a few DHL GF laptops and printers. The Rochester office was so bare that the management company for the building believed AEIDS had moved out some time ago. Upon information and belief, the contents of the AEIDS office were moved to the NADS office in Pittsford, New York, about 20 minutes away, which Armstrong leased and set up. The move of supplies and equipment from the AEIDS Rochester office to the NADS office likely occurred while Lyman was still employed by DHL Drawback.

65.    On October 20, 2025, former AEIDS employee Jean Halligan emailed a client of DHL Drawback, stating: "As of Friday, October 17th, both Jennifer Lyman and I are no longer with DHL Drawback Services. We are now with North American Drawback Services. My new contact information is below. If there's anything we can assist you with, please don't hesitate to reach out."

66.    Indeed, Lyman along with several other former AEIDS employees, were seen at the NADS office in Pittsford, New York on October 20, 2025.

### NADS's Operations

67.    NADS is engaged in a business that competes directly with AEIDS: drawback processing services.

68.    NADS is listed with U.S. Customs and Border Protection ("CBP") as a "Permitted Customs Broker" under Filer Code "NAS." The telephone number associated with NADS's CBP listing is connected to R. McDonald.

69.    NADS employs nine individuals to perform drawback processing services, each of whom was formerly employed by AEIDS.

70.    NADS is operating in direct competition with AEIDS. NADS operates at the direction of R. McDonald, Armstrong and Lyman, among others.

71.    As of October 17, 2025, former AEIDS employees already began working on behalf of NADS—including Lyman—and NADS employees or agents have had ongoing contact with several DHL Drawback customers about moving their accounts to NADS. Upon information and belief, Lyman and Armstrong will continue to use the information stolen from AEIDS to solicit its clients and cause irreparable harm to DHL Drawback. Indeed, three DHL Drawback customers have already terminated their service agreements with AEIDS following the mass resignation day.

### IV.    CAUSES OF ACTION

### Count I: Breach of Fiduciary Duty (Lyman)

72.    DHL Drawback incorporates the preceding paragraphs as if set forth fully herein.

73.    In her role as Vice President of AEIDS, Lyman held a position of trust and confidence and owed AEIDS fiduciary duties that required her to exercise the utmost good faith,

loyalty, and honesty in the performance of her duties and to not obtain an improper advantage over DHL Drawback.

74.    Lyman breached her fiduciary and statutory duties owed to AEIDS by, without limitation, misappropriating AEIDS' trade secrets, misusing AEIDS' confidential information, soliciting AEIDS' customers before the end of her employment, conspiring to bring about a mass resignation of AEIDS' employees, taking over AEIDS' server to effectively shut it out from its own network, and diverting and usurping AEIDS' corporate opportunities.

75.    Further, as a licensed customs broker whose license was associated with AEIDS, Lyman was obligated to exercise responsible supervision and control in connection with her broker duties pursuant to 19 CFR § 111.28. Lyman failed to do so upon abruptly exiting from AEIDS and refusing to hand over the information necessary to ensure continuity of business operations. Lyman's failure to provide this critical information violated her obligations as a licensed broker, demonstrating a lack of responsible supervision and control.

76.    As a direct and proximate result of Lyman's breaches of her duties as a fiduciary and a licensed customs broker, DHL Drawback has and continues to suffer significant damages and irreparable harm, and Lyman has been wrongfully enriched.

**Count II: Tortious Interference with Business Relationships (Armstrong and Lyman)**

77.    DHL Drawback incorporates the preceding paragraphs as if set forth fully herein.

78.    Defendants conspired to interfere in AEIDS' business relationships by soliciting its customers away from AEIDS to NADS.  Lyman also engaged in direct solicitation of AEIDS clients on behalf of R. McDonald and NADS.

79.    Defendants used dishonest, unfair, and improper means in soliciting AEIDS' customers, including by, without limitation, shutting down AEIDS' server, soliciting all of the

employees in AEIDS' Rochester office, directing the solicited employees to immediately go "out of office" and make themselves unavailable to assist with any transition, and directly contacting AEIDS' customers using AEIDS' confidential and trade secret customer lists and contact information to induce the customers to move to NADS.

80.    Defendants' actions have proximately caused injury to DHL Drawback, as at least three customers have already terminated their service agreements with AEIDS.

**Count III: Violations of Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq* (Lyman)**

81.    DHL Drawback incorporates the preceding paragraphs as if set forth fully herein.

82.    DHL Drawback's computers are used in interstate or foreign commerce and communication.

83.    DHL Drawback's protected computers are defined in the statute as high-speed data processing devices that perform logical, arithmetic, and/or storage functions.

84.    Lyman knowingly and intentionally accessed, without authorization and/or exceeding authorization, DHL Drawback's protected computers/servers to obtain DHL Drawback's confidential and trade secret information.

85.    Without authorization and/or exceeding authorization, Lyman acted intentionally and recklessly to take AEIDS' server offline for nearly a full business day to cause significant damage to AEIDS' business and to take advantage of AEIDS' downtime to solicit its customers and move their business to NADS.

86.    As a result of Lyman's knowing and intentional actions, she has forfeited any property rights to her storage devices and any other personal property used to facilitate the commission of their wrongful conduct.

87.     As a result of Lyman's knowing and intentional actions, DHL Drawback has sustained losses that, in the aggregate, exceed $5,000 in value over the last year, including expending resources to investigate the extent, scope, and effect of the unauthorized access.

88.     Lyman's violations of the CFAA have caused DHL Drawback economic damages. Specifically, the false statements made to AEIDS clients by Lyman on behalf of NADS have harmed AEIDS' reputation and goodwill and caused/continue to cause confusion as to whether AEIDS can continue to service clients. Equally so, Lyman's conduct on behalf of NADS to lock AEIDS out of its own business and shut the business down has harmed/continues to harm AEIDS irreparably if not stopped.

89.     At all relevant times, Lyman was an employee and/or authorized representative of NADS and was acting within the course and scope of her employment and/or agency relationship with NADS when she committed the foregoing violations of the CFAA. Armstrong, therefore, is liable for Lyman's acts in violation of the CFAA under the doctrine of respondeat superior, agency principles, and/or other applicable theories of vicarious liability.

### Count IV: Trade Secret Misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq* (Armstrong and Lyman)

90.     DHL Drawback incorporates the preceding paragraphs as if set forth fully herein.

91.     DHL Drawback has spent substantial financial resources developing and maintaining the secrecy of its trade secrets—including its customer lists, customer-related account information and files, and information contained in AEIDS' claims processing software—for its exclusive benefit. DHL Drawback's trade secrets derive economic value from the fact that they are neither generally known nor readily ascertainable by proper means by DHL Drawback's competitors or their employees, specifically including NADS and its employees. DHL Drawback

does not disclose its trade secrets to its competitors and has made reasonable efforts to protect them from unauthorized use and disclosure.

92.     Through their employment with AEIDS, Defendants acquired DHL Drawback's trade secrets, as that term is defined under the DTSA, including without limitation, customer lists, customer-related account information and files, and information contained in AEIDS' claims processing software.

93.     DHL Drawback provided its trade secrets to Defendants in confidence and with the understanding that Defendants would use the trade secrets solely to perform their responsibilities with AEIDS. Defendants knew that DHL Drawback intended for all such trade secrets to remain confidential and to be used solely to perform their responsibilities while employed with DHL Drawback.

94.     Defendants, both directly and through R. McDonald, A. McDonald, and others acting on their behalf, have misappropriated, and threaten to continue to misappropriate, DHL Drawback's trade secrets for the benefit of NADS in violation of the Defend Trade Secrets Act. NADS has in turn misappropriated DHL Drawback's trade secrets.  In anticipation of NADS becoming fully operational in providing duty drawback services to customers, Armstrong and Lyman accessed DHL Drawback's systems and misappropriated trade secrets related to DHL Drawback's customers and operations.

95.     Because Defendants misappropriated DHL Drawback's trade secrets and are threatening to continue doing so, they have violated and threaten to continue violating the Defend Trade Secrets Act.

96.     The misappropriation by Defendants has been and continues to be willful and malicious, as evidenced by their actions in the months and weeks leading up to Lyman's resignation from AEIDS.

97.     As a direct and proximate result of the conduct by Defendants, DHL Drawback has suffered significant losses and damages and is entitled to injunctive relief, restitution, exemplary damages, compensation, and attorneys' fees.

98.     Unless enjoined, Defendants' misappropriation and threatened misappropriation of DHL Drawback's trade secrets will cause irreparable harm and continued irreparable harm to DHL Drawback, for which it cannot be fully and adequately compensated unless Defendants are enjoined as requested.

**Count V: Trade Secret Misappropriation under New York Common Law (Armstrong and Lyman)**

99.     DHL Drawback incorporates the preceding paragraphs as if set forth fully herein.

100.    DHL Drawback has spent substantial financial resources developing and maintaining the secrecy of its trade secrets—including its customer lists, customer-related account information and files, and information contained in  AEIDS' claims processing software—for its exclusive benefit. DHL Drawback's trade secrets derive economic value from the fact that they are neither generally known nor readily ascertainable by proper means by DHL Drawback's competitors or their employees, specifically including NADS and its employees. DHL Drawback does not disclose its trade secrets to its competitors and has made reasonable efforts to protect them from unauthorized use and disclosure.

101.    Through their employment with AEIDS, Defendants acquired DHL Drawback's trade secrets, as that term is defined by the common law of the State of New York, including

19

without limitation customer lists, customer-related account information and files, and information contained in AEIDS' claims processing software.

102.  DHL Drawback provided its trade secrets to Defendants in confidence and with the understanding that Defendants would use the trade secrets solely to perform their responsibilities with AEIDS. Defendants knew that DHL Drawback intended for all such trade secrets to remain confidential and to be used solely to perform their responsibilities with DHL Drawback.

103.  Defendants, both directly and through R. McDonald, A. McDonald, and others acting on their behalf, have misappropriated, and threaten to continue to misappropriate, DHL Drawback's trade secrets for the benefit of NADS. NADS has in turn misappropriated DHL Drawback's trade secrets.  In anticipation of NADS becoming fully operational in providing duty drawback services to customers, Armstrong accessed DHL Drawback's systems and misappropriated trade secrets related to DHL Drawback's customers and operations.

104.  The misappropriation by Defendants has been and continues to be willful and malicious, as evidenced by their actions in the months and weeks leading up to Lyman's separation from AEIDS.

105.  As a direct and proximate result of the conduct by Defendants, DHL Drawback has suffered significant losses and damages and is entitled to injunctive relief, restitution, exemplary damages, compensation, and attorneys' fees.

106.  Unless enjoined, Defendants' misappropriation and threatened misappropriation of DHL Drawback's trade secrets will cause irreparable harm and continued irreparable harm to DHL Drawback, for which it cannot be fully and adequately compensated unless Defendants are enjoined as requested.

## V.    REQUEST FOR TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

107.    DHL Drawback incorporates the preceding paragraphs as if set forth fully herein.

108.    Defendants have caused, are causing, and will continue to cause great and irreparable harm to DHL Drawback's business, which cannot be remedied adequately by an award of monetary damages.

109.    The irreparable harm includes Defendants' misappropriation of DHL Drawback's trade secrets and/or confidential information; solicitation of DHL Drawback's customers and employees; and competition against DHL Drawback.

110.    Unless immediately restrained, Defendants will cause further irreparable harm to DHL Drawback for which there is no adequate remedy at law.

111.    As detailed in the motion that DHL Drawback will file, DHL Drawback is entitled to a temporary restraining order, preliminary injunction, and permanent injunction:

a)    enjoining Defendants from directly or indirectly using or divulging, or threatening to use or divulge, for any reason, DHL Drawback's trade secrets and/or Confidential Information;[2] and requiring Defendants to immediately return to DHL Drawback all of DHL Drawback's trade secrets, Confidential Information, and other property that Defendants have in their possession, custody, or control, or (if the trade secrets and Confidential Information are in digital form) to permanently

---

[2] Confidential Information includes information disclosed to Defendant R. McDonald or known by him as a result of his position as manager of AEIDS about AEIDS's or DHL GF's employees, directors, officers, partners, shareholders, advertising methods, business plans, processes, trade information, methods and forecasts, customer, customer and vendor lists, finances, pricing information, trademarks, trade secrets and other intellectual property and any other information which he should reasonably understand to be confidential.

delete all such trade secrets and Confidential Information, and file an affidavit certifying that such deletion occurred; and

b)    enjoining Defendants from assisting, encouraging or conspiring with R. McDonald to violate or circumvent R. McDonald's compliance with his non-competition, non-solicitation and non-disclosure restrictions in the Management Agreement, including but not limited to:

i)    providing duty drawback services to any DHL Drawback Customer;[3]

ii)    requesting or advising, explicitly or implicitly, any DHL Drawback Customer or any of AEIDS' agents to withdraw, reduce or cancel its business relationships with DHL Drawback;

iii)    interfering with any customer or business relationship of DHL Drawback; and

iv)    offering, accepting, providing, or servicing business related to duty drawback services to any DHL Drawback Customer.

## VI.    BOND

112.    Bond should be set at a reasonable amount. DHL Drawback seeks only to maintain the status quo by preventing Defendants from unlawfully competing through their stolen trade secrets and confidential information, and to stop other ongoing unlawful activity.

## VII.    CONDITIONS PRECEDENT

113.    All conditions precedent to DHL Drawback's claims for relief have been performed or have occurred or were otherwise met, waived, or excused.

---

[3] Customer is any customer of AEIDS or DHL GF and any prospective customer to whom AEIDS or DHL DF has made a presentation (or similar offering of services) during the six month period prior to the date of termination of the Management Agreement.

## VIII.    JURY DEMAND

114.    DHL Drawback demands a trial by jury as to all claims that may be tried to a jury.

## IX.    PRAYER FOR RELIEF

115.    Furthermore, DHL Drawback respectfully requests that the Court:

a)  issue a temporary restraining order enjoining Defendants, as set forth above;

b)  after notice and a hearing, issue a preliminary injunction as requested above, pending a trial on the merits;

c)  enter judgment in favor of DHL Drawback and against Defendants;

d)  award DHL Drawback all damages that it has sustained as a result of Defendants' wrongful conduct described above, beginning with the earliest date of violation up until the date of the entry of the final judgment in this action, including actual and consequential damages;

e)  award DHL Drawback punitive and exemplary damages;

f)  award DHL Drawback pre- and post-judgment interest;

g)  award DHL Drawback attorneys' fees and costs; and

h)  grant DHL Drawback all other relief, in law and in equity, to which DHL Drawback may be entitled.

Dated: November 7, 2025                      Respectfully submitted,

                                             */s/ August W. Heckman III*
                                             August W. Heckman III
                                             **Morgan, Lewis & Bockius LLP**
                                             502 Carnegie Center
                                             Princeton, NJ 08540-6241
                                             T:  609.919.6600
                                             F:  609.919.6701
                                             E:  august.heckman@morganlewis.com

                                             Jennifer Bullock (*pro hac vice* pending)
                                             **Morgan, Lewis & Bockius LLP**
                                             600 Brickell Avenue, Suite 1600
                                             Miami, FL  33131-3075
                                             T:  305.415.3000
                                             F:  305.415.3001
                                             E:  jennifer.bullock@morganlewis.com

                                             Donald E. English Jr. (*pro hac vice* pending)
                                             **Morgan, Lewis & Bockius LLP**
                                             1111 Pennsylvania Avenue, NW
                                             Washington, D.C.  20004-2541
                                             T:  202.739.3000
                                             F:  202.739.3001
                                             E:  donald.english@morganlewis.com

                                             Tyler J. Hill (WDNY Admission pending)
                                             **Morgan, Lewis & Bockius LLP**
                                             NY Bar No.: 5285655
                                             1717 Main Street, Suite 3200
                                             Dallas, TX 75201-7347
                                             T:  214.466.4000
                                             F:  214.466.4001
                                             E:  tyler.j.hill@morganlewis.com

                                             *Counsel for Radix Group International, Inc. and*
                                             *AEI Drawback Services, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2025, a true and correct copy of the foregoing was served on the Court's CM/ECF system to which all counsel of record has access, and a copy of the foregoing will be served on Defendants with the Corporate Disclosure Statement and Civil Summons.

*/s/ August W. Heckman III*
August W. Heckman III